We'll now move to the second case on today's calendar. That is Joshi v. Trustees of Columbia University. I'm not sure if I'm pronouncing that first name right, but I'm sure Council will let me know. Thank you. Joshi v. Trustees of Columbia University Okay. Is it Mr. Jeremias? Jeremias. Jeremias. Okay, so I got your name wrong. And how about your flag? Joshi. Joshi. So I got that one right. So that's a bet in 50-50. All right. Mr. Jeremias, you have ten minutes, but you've got two minutes of rebuttal, so that gives you eight out of the gate. The floor is yours. You may proceed. Thank you. Good morning, Your Honors, and may it please the Court. I'm Jonathan Jeremias for the plaintiff and appellant, Shalindra Joshi. Having decided and determined that the University's policies are contracts that obligate the University to protect That's not quite right. The Court decided there were questions of fact as to whether they are policies. Correct. I mean, whether they are contracts. Correct. Just to be precise. Yes. Going beyond that issue, though, the Court granted summary judgment dismissing the claims, and this appeal raises significant issues of material fact that the district court overlooked or completely disregarded warranting reversal, the first of which deals with timing. The district court determined that this was interpersonal conflicts that predated the protected activity when Dr. Joshi complained about the division chief's suspected research misconduct in early 2014. What the district court overlooked and what is significant is that there was no dispute that there was an agreement reached between the department and Dr. Joshi as early as 2011 with respect to restricting his clinical time and not assigning him ECT, this electroconvulsive therapy, which is clinical and takes up from his dedicated research time. And for a period of three years... There seemed to be evidence, undisputed, I think, that circumstances changed. The needs changed. Someone else was out on attorney leave. They needed more staffing for the clinical part. It is our position that the circumstance which changed and why the division chief, who was responsible for the schedules, and Dr. Wood, the chair of the department, changed their agreement, broke their agreement, in fact, was because Dr. Joshi had raised these allocations of research misconduct. What evidence is there in the record of a retaliatory motive? I mean, you have to prove that, right? Correct. Intent to retaliate? What evidence is there that anyone in a decision-making position intended to retaliate against him? I believe there are two things. One is we begin with the division chief's reaction to this, and when he goes to the chair of the department and says, I'm going to formally accuse Joshi of harassment and I'm going to seek that he be removed from this institution or short of that from the department, Dr. Wood, who is responsible under the research misconduct and non-retaliation policies to protect Dr. Joshi and perhaps informally resolve it at this stage, doesn't do anything on behalf of Dr. Joshi but instead works with the division chief towards his rebuttal and advises him about how to go about accusing Dr. Joshi of harassment. The division chief's reaction occurs before the protected activity, though, right? Well, my second argument on timing... The protected activity is in April of 2015 when he formally complains about what he believes to be misconduct? That was going to be my second argument on timing, and I believe the district court made an error in determining that. On your first argument, the division chief's reaction, my question is, did that not occur before the protected activity? I believe the protected activity occurred in December of 2014 based on not just the research misconduct policy but the non-retaliation policy itself. The district court stated that Joshi didn't avail himself of the protections of the non-retaliation policy because he didn't complain directly to the chair... What is the protected activity in December 2014, so I understand? ...is Dr. Joshi raising concerns in emails to the division chief and to the vice chair of research, Dr. Charles Emla, and then the division chief going to Dr. Wood, the chair of the department, and conveying in specific detail Dr. Joshi's claims of potential research misconduct, which the division chief... which the chair of the department received on January 5th of 2015. How does that type of complaint, as you're framing it in December 2014, you're talking about Dr. Joshi making statements to two individuals who then, presumably at his request, relaying that to Dr. Wood, and that should satisfy the policy's requirement of a complaint that he's said something to certain individuals, they've passed it along informally to someone else. How does that fit with what the policies are designed to address in terms of making the requirement to make a complaint to a responsible official? I believe that the policies aren't so rigid as to require a formal complaint. In fact, what Dr. Joshi was doing was making an inquiry, which the policies or the language of the policies themselves also cover. How is an inquiry a complaint? Well, Dr. Joshi was raising questions about the integrity of the division chief's research, about the data, whether or not all the patients that were used in the data set actually completed these studies. And in fact, Dr. Emla, who is the vice chair of research and the division chief, stated that they believed at the time he was inquiring that he was raising issues of research misconduct and integrity. But the person to whom he complained in an email was not in a position to really do anything, right? I'm sorry. Dr. Emla is who he sends his email to in December of 2014, correct? Correct. And so how is that a protected activity? Dr. Emla is not in a position to investigate or to punish the offending party for the research misconduct. Well, I believe he is. Why is he? As vice chair of research, the research misconduct policy also talks about going to officers of research with inquiries. And the non-retaliation policy— Just to follow up on Judge Sullivan's question, I'm looking at the December 19th email, which is at A1427. Dr. Joshi is simply asking a question of the division chief. Is it true that all 411 patients completed the testing, not a single patient dropped off? He's just asking questions. How is that a complaint that's covered by the no-retaliation policy? I believe that the question is getting at the heart of the issue, which is whether or not there was research misconduct. And again, I defer back to the individuals and their beliefs at the time that they thought Dr. Joshi was inquiring about concerns of integrity and research misconduct. And then there was a culmination of follow-up emails that were directed both at the vice chair of research and the division chief and further to the chair of the department, Dr. Wood. I believe that, in addition, there were substantial errors of disregarding facts with regard to the promotion. There was a contention as to what actually occurred and transpired. Dr. Wood said she encouraged a meeting. There wasn't any evidence that she actually did, and Dr. Joshi denied ever being asked to attend a meeting. And I think those issues of fact being disregarded was error for the court below. In addition, with the non-clinical assignments and the increase, I think that the district court failed in not regarding the fact that Dr. Joshi was singled out for these assignments. As the division chief said, he didn't inquire as to anyone else, after breaking their prior agreement, for anyone else in the department to cover these assignments but Dr. Joshi. And, again, the district court states that when Bamberg took over, Dr. Bamberg took over, he immediately promoted Dr. Joshi. But the fact is that Dr. Joshi had requested a promotion from him on three separate occasions over a year, and it wasn't until he commenced this action that a plan was developed to actually promote him, albeit not to full professor, which at the time the academic dean, Ann Taylor, stated that he could be promoted to full professor. It was at the discretion of Dr. Bamberg, which she chose not to exercise. We believe that there was evidence in the record of a retaliatory animus by others in his department expressing dissatisfaction with Dr. Joshi going forward with these allegations of research misconduct that are specifically stated in emails. And I believe I've gone over my time. All right. Well, you've reserved two minutes for rebuttal. So we'll now hear from Mr. Schilling on behalf of Columbia. Good morning, Your Honors. May it please the Court. I'm Andrew Schilling from Buckley, LLP, on behalf of Columbia University. With respect to the issue of timing, Dr. Joshi is asking the courts to enforce Columbia's manual and policies as contracts, and yet he doesn't want to be held to the language in those supposed contracts. The protected activity under the research misconduct policy is the making of an allegation. An allegation under the research misconduct policy is specifically defined as a formal allegation of research misconduct, and research misconduct is defined as fabrication, falsification, or plagiarism, and it specifically excludes differences of opinion or honest errors. And there is no evidence that Dr. Joshi engaged in protected activity prior to April 3, 2015, when he made a formal complaint of research misconduct to the appropriate office at Columbia. The e-mails that Mr. Jeremias is referring to from the December-January time frame are posing questions, and Dr. Joshi himself says in those e-mails that the division chief's research might just be sloppy. That's not fabrication, that's not falsification, that's not plagiarism. It's at best an honest error. He also says that the research of the division chief might be shoddy, and in his deposition he referred himself to those e-mails in that time frame as raising, quote, scientific questions. None of that is protected activity under the policy, and most of the claims that Dr. Joshi is making in this case relate to events that occurred prior to April of 2015. So with respect to the timing issue, the timing doesn't support a retaliatory motive, and nothing else in the record supports a retaliatory motive. When Mr. Jeremias talks about Dr. Brambrink, Dr. Brambrink wasn't at Columbia until 2016, and when he joined from outside the institution, he promotes Dr. Joshi. He supports the two-step promotion. He writes a letter in favor of the promotion, and there's no evidence in this record that Dr. Brambrink harbored a retaliatory motive. When did Dr. Brambrink arrive in 2016? I believe it was June or July of 2016. So more than a year after the protected activity? Correct, Your Honor. And by that point also, the division chief, who was the subject of the research misconduct complaint, had retired. The only evidence that Dr. Joshi points to in the record that there could be a retaliatory motive on the part of Dr. Brambrink is that Dr. Brambrink did not express an interest sufficient to Dr. Joshi's mind in his research or in the allegations with respect to the division chief. Dr. Brambrink did not follow up on that. And from that, he says he has a retaliatory motive. He also cites the fact that Dr. Brambrink once referred to Dr. Joshi as disgruntled in an email to a colleague. But if there's one fact that's undisputed in this case, Your Honors, it's that Dr. Joshi is disgruntled. He's been disgruntled for 20 years. His emails certainly suggest he was disgruntled. And they don't suggest that that reference means that Dr. Brambrink was somehow angry for Dr. Joshi having raised an issue of research misconduct under a prior dean at a time when he wasn't even at the university. With respect to the non-clinical time, Your Honor, the schedules speak for themselves, as Judge Kodal found. If you look at the schedules, there is no decline in the amount of non-clinical time that Dr. Joshi is getting. You know, my law clerk added it all up. And after April of 2015, there's an average of 1.9 ECT days per month, whereas before there were zero. So the numbers do go up. There's two issues, I think, in there, Your Honor. One is the non-clinical time, which can include ECTs. And the other is ECTs themselves, which he was not in the rotation for ECTs for a long period of time because that agreement that he refers to, which was not a formal agreement, it was an understanding that the department had, was made during a time when Dr. Joshi had two R01 research grants from the NIH. And those R01 research grants are significant grants that give you 30% protected time each. So at the time there was a discussion about Dr. Joshi not being in the rotation for ECTs, he had 60% protected time. By the time we get to the time period at issue here in 2015, one of those grants had already expired. He's down to 30% protected time. And if you look at the amount of protected time he's actually being given by the department during that period, what you see is that the numbers are, for example, in June of 2015, shortly after the April filing of the research misconduct complaint, he's got 73% protected time instead of the 30% he was entitled to from having the single grant. He had zero ECTs at that time. The first time he is even assigned a single day of ECT is in July of 2015, in which he gets one day. One day of ECTs, and he's got 61% protected time during that month. Okay, so he's not being, he's not being precluded from doing the research he wants to do. He's got more time to do the research than he's entitled to, and he's doing more than others in the division. Does the record indicate whether any other members of the department had zero ECT days? I'd have to look back, Your Honor. Those records are there. With respect to ECTs, they're assigned based on a number of factors. It matters whether or not you have research time. So if, for example, someone has a grant that gives them 75% research protected time, they may not be in the ECT rotation during that period. But for the grants then, protected time, that it was a matter of course for members of the department to be assigned to the clinical days? Absolutely, Your Honor. And I think to take a step back, what Dr. Wood testified in this case is that, look, it's not in the department's interest for Dr. Joshi not to get these grants. This grant money flows to the department. It pays for salaries. It pays for labs. Dr. Joshi's lab costs about $200,000 a year to run. The department wants its research scientists to get this sort of funding. And if you're not getting that funding, you're expected to support yourself in other ways, such as by doing clinical work, and that can include ECTs. And so what the record ultimately shows is that as Dr. Joshi's protected research time goes down because he's getting fewer grants, he's expected to do more in the nature of clinical activity. He doesn't want to do it. He has a personal preference not to do it, but a personal preference is not an entitlement. And again, when you look at the actual schedules, he's getting very little ECT time at all and less than others in the department. In August, one ECT day and yet 54% protected research time. And how are we to compare less than others in the department? I think that was Judge Chin's question. If you look at the records and they're in the appendix A371 to 373, you see, for example, that in August 2015, Dr. Joshi had a grand total of one ECT day. Dr. Gaudet had two. Dr. Anastasian had three. Dr. Berman had four. In September, Dr. Joshi had three. Dr. Gaudet had four. And Dr. Berman had four. Dr. Joshi's always getting less than everybody else. And is he otherwise similarly situated to them in terms of research grant time, protected time? Yes. They're all expected to be doing research and they're all expected to be doing clinical work. Well, I mean, they have the same number of grants, I guess, is my question. I don't have that in front of me, Your Honor, but those are all factors. But so long as Dr. Joshi is getting the same or better treatment with respect to ECTs and the others, he really doesn't have a basis to say he's being retaliated against. Nor can he say that he's being prevented from doing research. Again, if you looked at the protected research time, he's got more than enough research time to be putting in grants, and he did. He applied for another R01 grant in October of 2015. So the fact that he had to do a day of ECT work here and there, again, less than his colleagues, did not in fact prevent him from doing any research. And in any event, this is a contract case, Your Honor. And so what is the damage that flows from if this is a breach of contract? This money flows to the university, not Dr. Joshi. And again, it's in the university's interest that that money flow to them to pay for the salaries, to pay for the labs. I guess a similar point you make in your brief is that the fact that they don't close his lab, even though he ceased to have any outside funding for several until 2021, also undermines an inference of retaliatory intent. Yes, Your Honor, and that goes to Dr. Brambrink. Dr. Brambrink comes in, and what does he do? He promotes Dr. Joshi, perhaps not as fast as Dr. Joshi would have liked. But there were others in the queue ahead of Dr. Joshi who had actually gone through the process under Dr. Wood, and it's undisputed that he did not go through the process under Wood. He refused to go through the process under Dr. Wood. But he gets to Dr. Brambrink, and everything goes his way. Dr. Brambrink has every right to close that lab in March of 2017 when the government stops sending research money attributable to Dr. Joshi. He doesn't. He provides breach funding after that. And he gives Dr. Joshi every chance, 2017, 2018, 2019, 2020. The university is paying for his lab during all that time. Dr. Joshi is given every opportunity to apply for more grants. And even when they shut down his lab, and I think it was in January 2021 or so when they shut down the lab finally, they said, look, we'll pack everything up. And if you get grants, we'll reopen it. And so this is a person he's accusing of retaliatory motive based on absolutely nothing. Can I ask you a quick, you're over time, but I wanted to ask you a question about the Section 1715 provision from the New York non-for-profit law. So I guess you make two arguments. One is that there's no disputed facts that would support a violation of that in the first place. Also, there's no private right of action. Correct. But for the no private right of action, the legal conclusion, there's no New York Court of Appeals ruling on that, correct? Correct, Your Honor. And so do you think that the state case law is sufficiently clear that we can say that's what the law is? Or we need to refer to the New York Court of Appeals to determine whether or not there's a private right of action? I don't believe Your Honor needs to get to that case, that decision point in this case, because the court can affirm on any basis in the record. And the absence of any evidence of an actual breach of the policy or the statute is sufficient to avoid that question. If the court had to reach the question, I think there is law that the court could look to without certifying it to the New York Court of Appeals. Well, is it sufficiently clear, I guess, that's really the question. There are only a handful of decisions, I think two, that address it at all. And we would submit that both of them are incorrectly decided. If you look at the legislative history of that statute, one thing screams out at you, which is the New York legislator passed that law to protect nonprofits. That was the goal. There was a number of reforms. They said you should have conflict of interest policies. You should have anti-retaliation policies. But the goal was to have more nonprofits coming to New York. So the notion that there should be a private right of action for this type of retaliation and that the legislator wanted to have that solely be available against nonprofits is anathema to what the legislature was trying to do when it enacted that statute. Okay. Thank you very much. We'll now hear from Mr. Jaramais for two minutes of rebuttal. Thank you, Your Honor. Thank you. I just wanted to underscore earlier arguments about the purpose of the non-retaliation policy. Before you do that, the evidence with respect to the grants expiring and much less protected time and Columbia continuing to carry them for several years, it's pretty powerful evidence that there was no intent to retaliate. How do you deal with all of that? Well, first I wanted to address the issue of the comparators because Dr. Joshi was the only one in that department with a federal grant. All of the people that they compare him to who had – Why should he have continued to have been relieved of that duty that apparently everyone else had to – Well, to be clear, he still had his grant. The idea or the concept of saving his lab – his grant expired in 2017. He then filed a lawsuit against Columbia alleging that they were closing his lab or taking action to close his lab and to effectively nullify his position as a research scientist. And then all of a sudden – The argument is they carried him for three years because they were worried about this lawsuit? Well, they have carried others for longer periods of time. They've kept labs open for individuals providing bridge funding. Here I think it's also in the record that what they did was essentially kept the lights on and the door open, but Dr. Joshi was not given sufficient funding to continue to conduct research. I also think the diminution of non-clinical time or the increases in clinical time in ECT were meant to affect his ability to put forward additional grants so that he would on his own be able to continue on in his research. And again, I think that the issue of – Are you just suggesting that there is an intent to prevent him from getting additional funding? I mean, to the extent that this is something that helps the university when people are able to get funding and grants, why would it be in the university's interest to actively discourage him from getting funding? If that's what you were implying, I don't know. I think the division chief made clear at the outset what his intentions were with respect to Dr. Joshi, which was to have him removed from the institution, which he conceded in many avenues he went he couldn't do on his own. The chair could not do on her own. But you're saying that that's a statement that was made in 2014, right? At the end of 2014, beginning of 2015, he pursued it on various avenues by going to the EEO office complaining about Dr. Joshi to Dean Taylor as well to see if he can – as he says in his deposition, he wanted to make a case for having Joshi removed from the institution. Right, but none of it happened. I mean, that's the point. You're focusing on the words, I guess, of an angry person who's been accused of improper science or science methods. But over the next five years, nothing happened. I mean, he doesn't lose his position. He gets promoted. His lab is kept open even though he has no grants. Doesn't that all undermine an inference of retaliatory intent? Well, I think the statement itself demonstrates the retaliatory intent and then the actions that follow, the diminution of non-clinical time and the increases and the ECT all of a sudden when there was – But they're not all of a sudden, right? I mean, he has lost a contract. He's lost one of his research grants, so he's down to one. And the needs of the department have changed because somebody is going out on leave, right? I mean, that's undisputed in the record, isn't it? I believe there is someone going out on leave, but as the division chief said, that occurred also in the past when they had their agreement where they needed someone to step in for ECT. And they didn't go to Dr. Joshi at that point. So what I'm trying to emphasize is that this agreement was broken for a reason after a period of time where there were no complaints. And that reason was because the division chief was retaliating against Dr. Joshi. But the division chief is gone within months after that, right? So the length of this suit, I mean the length of the complaint conduct is long after the division chief is gone, right? The division chief leaves in December of 2015, but he doesn't actually leave. He has a special assignment in the Department of Neurosurgery, and he's still involved in the Department of Anesthesiology advising Dr. Bamberg. But in that time period after the complaint, let's say December 2014, January 2015, the division chief is still there. He's the one responsible for the schedules. He was there during the incident where Dr. Joshi had asked for a promotion and joint appointment, and Dr. Wood denied it or refused to meet with him as the evidence is. So he was still actively involved. But the first ECT is when? It is July, but that is by nature of the fact that in February he was asked to regain his privileges. He needed privileges in order to conduct ECT, and the application process took until June, at which time they can actually put him on the schedule. All right. Okay. Well, I think we got our money's worth, so thank you both. We will reserve decision. That concludes our arguments on the calendar for today. We have two others that we will consider on submission. I want to thank our courtroom deputy and our court security officer and everybody who makes it such a pleasant place to work and to argue cases here. It's nice to be back, and I think it makes you appreciate what a well-run court and what a great courthouse this is.